J-A28022-17

2018 PA Super 196

| | | |
|---|---|---|
| MELISSA DEAN, INDIVIDUALLY AND AS CO-ADMINISTRATOR OF THE ESTATE OF ANDREW E. JOHNSON AND CLIFTON EDWARD JOHNSON, INDIVIDUALLY AND AS CO-ADMINISTRATOR OF THE ESTATE OF ANDREW E. JOHNSON | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : | No. 963 EDA 2017 |
| v. | : : : : | |
| BOWLING GREEN-BRANDYWINE, CRC HEALTH GROUP, INC. (AND/OR) D/B/A CRC HEALTH GROUP, MOHAMMAD ALI KHAN, M.D., ASIM KHURSHID RANA, M.D., JENNERSVILLE REGIONAL HOSPITAL, JAMES DUNCKLEE, M.D., JENNIFER M. PLUMB M.D., SOUTHERN CHESTER COUNTY EMERGENCY ROOM ASSOCIATES, P.C. | : : : : : : : : : : : | |

Appeal from the Judgment Entered March 22, 2017
In the Court of Common Pleas of Chester County
Civil Division at No(s):  2014-11603

BEFORE:  GANTMAN, P.J., PANELLA, J., and DUBOW, J.

OPINION BY PANELLA, J.                                    **FILED JULY 2, 2018**

In this appeal, we must determine whether the trial court properly granted nonsuit based upon the application of the limited immunity provision of the Mental Health Procedures Act ("MHPA" or "the Act"). The limited immunity provision of the MHPA, 50 P.S. § 7114, is intended "to provide limited civil and criminal immunity to those individuals and institutions

charged with providing treatment to the mentally ill." *Farago v. Sacred Heart General Hospital*, 562 A.2d 300, 303 (Pa. 1989). To this end, § 7114 provides that those who are engaged in treating or examining a patient "under the act" cannot be held liable absent "willful misconduct or gross negligence."

The Act applies, in relevant part, to the "voluntary inpatient treatment of mentally ill persons." 50 P.S. § 7103. The Act does not define the term "mentally ill person." Furthermore, no party to this appeal has identified any case law that explicitly addresses the definition of "mentally ill person" or "mental illness" under the MHPA. The Department of Human Services has issued regulations defining "Mental illness" as

> [t]hose disorders listed in the applicable APA Diagnostic and Statistical Manual; provided, however, that mental retardation, alcoholism, drug dependence and senility do not, in and of themselves, constitute mental illness. The presence of these conditions, however, does not preclude mental illness.

55 Pa. Code § 5100.2.

In contrast, the MHPA explicitly defines "treatment." "Treatment shall include diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness and shall also include care and other services that supplement treatment and aid or promote such recovery." 50 P.S. § 7104. This definition evinces the legislature's intent to define "treatment" broadly, so that it includes "medical care coincident to mental health care." *Allen v. Montgomery Hospital*, 696 A.2d 1175, 1179 (Pa. 1997). Thus, "the General Assembly decided to

- 2 -

ameliorate certain risks by granting limited immunity to doctors and hospitals who have undertaken the treatment of the mentally ill, including treatment for physical ailments pursuant to a contract with a mental health facility to provide such treatment." *Id*.

Here, the trial court applied this statutory framework in the following manner. Andrew Johnson was twenty-three years old when he voluntarily applied for admission to Bowling Green Brandywine Treatment Center ("Brandywine"). Johnson was suffering from addiction to opiates and benzodiazepines, which had been prescribed for back injuries suffered in an ATV accident. Less than ten days after he was admitted, he was found unresponsive on the floor of his room at Brandywine. He subsequently passed away.

Johnson's parents, Melissa Dean and Clifton Johnson, as co-administrators of Johnson's estate and in their respective individual capacities, filed a complaint alleging Johnson's death was caused by medical malpractice on the part of Brandywine and associated defendants. Of relevance to this appeal, three defendants, Mohammad Ali Khan, M.D., Asi Khurshid Rana, M.D., and Jennifer Plumb, M.D.,[1] asserted in new matter that they could not

_____

[1] Dr. Plumb passed away after this lawsuit was initiated. While her estate was substituted as party to this proceeding, we will refer to Dr. Plumb for ease of reading.

be held liable for anything less than "gross negligence" under the MHPA. Two of the remaining defendants,[2] Brandywine and James Duncklee, M.D., did not initially raise this defense in their answers.

The case proceeded to trial. Appellants presented their case primarily through the expert testimony of George Glass, M.D. Dr. Glass reviewed the medical records from Johnson's stay at Brandywine, and opined the defendants had all breached their duty of care to Johnson by failing to recognize symptoms suggesting Johnson was at high risk for cardiac arrest.

Similarly, Appellants presented the expert testimony of Crystal Fizpatrick, R.N., A.P.N., Ph.D. Dr. Fitzpatrick opined on the care provided by nurses employed by Brandywine. Specifically, she testified Brandywine breached the standard of care by not ensuring a Registered Nurse was on site at all times. Furthermore, she opined the Licensed Practical Nurses who were on site did not do enough to convince Dr. Khan to have Johnson transferred to emergency care the night before he died.

Edward Goldenberg, M.D., provided expert testimony regarding the cause of Johnson's death. He opined Johnson died from a cardiac arrhythmia caused by deficient potassium levels and side effects of the medications in his system.

_____

[2] Defendant Jennersville Regional Hospital settled prior to trial.

Johnson's parents each testified, as did economic expert Royal Bunin. Each of these witnesses provided testimony relevant to damages.

Finally, Appellants called Elizabeth Caterbone, L.P.N., as a hostile witness. Appellants questioned Nurse Caterbone regarding her decisions while treating Johnson. In particular, she testified to the steps that were taken during Johnson's final hours of life.

Appellants rested, and Dr. Khan, Dr. Rana, and Dr. Plumb moved for the entry of an involuntary nonsuit. They argued Appellants had failed to present evidence capable of establishing willful misconduct or gross negligence. Brandywine and Dr. Duncklee requested permission to amend their pleadings to raise the defense of limited immunity under the MHPA.

The trial court initially denied Brandywine's and Dr. Duncklee's request to amend their pleadings. However, it later reconsidered, noting that Appellants could not establish undue prejudice, as the pleadings of Dr. Khan, Dr. Rana, and Dr. Plumb had notified Appellants that the issue would be litigated. Furthermore, the court concluded the MHPA applied to Appellants' claims based upon the evidence presented. Finally, the court determined Appellants had failed to present evidence capable of establishing that any of the defendants had been grossly negligent in their care of Johnson. As a result, the court granted nonsuit to all of the remaining defendants.

The trial court denied Appellants' motion to remove the nonsuit and Appellants filed this timely appeal.[3]

A nonsuit is only proper if the court,

> viewing the evidence and all reasonable inferences arising from it in the light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action had been established. Furthermore, all conflicts in the evidence must be resolved in the plaintiff's favor.

*Harvey v. Rouse Chamberlin, Ltd.*, 901 A.2d 523, 526 (Pa. Super. 2006) (citation omitted).  Nonsuit is granted in circumstances where a contrary result would be based upon mere conjecture. *See id*. We may affirm the trial court's order on any basis, regardless of the reasoning relied upon by the trial court. *See Shearer v. Naftzinger*, 747 A.2d 859, 861 (Pa. 2000). "We will reverse only if the trial court abused its discretion or made an error of law." *Harvey*, 901 A.2d at 526 (citation omitted).

---

[3] Appellants' notice of appeal cites the February 22, 2017 order refusing to lift the nonsuit as the order from which they appeal. "Orders denying post-trial motions … are not appealable. Rather, it is the subsequent judgment that is the appealable order when a trial has occurred." *Harvey v. Rouse Chamberlin Ltd.*, 901 A.2d 523, 525 n.1 (Pa. Super. 2006) (citation omitted). We treat a motion to remove a nonsuit as a post-trial motion. *See Billig v. Skvarla*, 853 A.2d 1042, 1048 (Pa. Super. 2004). Here, judgment was entered by praecipe on March 22, 2017; thus, Appellants' notices of appeal were mislabeled. Despite their errors, we will address the appeal because judgment has been entered on the verdict. *See Mount Olivet Tabernacle Church v. Edwin L. Wiegand Division*, 781 A.2d 1263, 1266 n.3 (Pa. Super. 2001). We have corrected the caption accordingly.

Appellants first claim the trial court erred in concluding the MHPA applied to this case. They correctly argue that Johnson's drug addictions do not, by themselves, constitute mental illness under the Act. **See** 55 Pa. Code § 5100.2.[4] They further argue the court could not find that Johnson suffered from mental illness or that he was diagnosed or treated for mental illness at Brandywine without considering improper evidence.

The limited immunity provisions of the MHPA constitute an affirmative defense. **See Heifetz v. Philadelphia State Hospital**, 393 A.2d 1160, 1162 n.5 (Pa. 1978) (noting "immunity from suit is an affirmative defense"). **See also** Pa.R.Civ.P. 1030(a) (defining immunity from suit as an affirmative defense). Thus, the defendants, as the parties asserting the defense of limited immunity, bore the burden of proof on this issue at trial. **See Beato v. Di Pilato**, 106 A.2d 641, 643 (Pa. Super. 1954). Even more relevant here, in order to receive the benefit of a nonsuit, they were required to establish the complete absence of any reasonable dispute of material fact regarding its application.

_____

[4] We are troubled that the current definition of "Mental illness" provided in the Code excludes alcoholism and drug dependency. **See** 55 Pa. Code § 5100.2. In light of current scientific research, as well as the recent addition of "addictive disorders" to the American Psychiatric Association's Diagnostic and Statistic Manual V, we suggest that the Department of Human Services revise this definition. **See** https://www.nimh.nih.gov/health/topics/substance-use-and-mental-health/index.shtml (discussing substance use disorder as mental illness) (last visited June 29, 2018).

The court provided the following as the basis for its decision:

I think the record discloses that Mr. Johnson, upon presentation at Bowling Green, was noted to have a history of psychiatric treatment for bipolar disorder and ADHD. Somewhere in the record there was a note that he had tried Depakote and Lithium and that didn't work for him, but that he was on Xanax, which seemed to work, at least as to another complaint of anxiety. I'm not sure anxiety is a physical ailment.

The diagnosis was carried in his chart. And while not confirmed by any of the doctors, was confirmed by his mother. So it was not made up about an actual diagnosis and medications were ordered on an as-needed basis, including Clonidine as needed for anxiety and/or withdrawal symptoms.

He was transported on an emergent basis, after four days at Bowling Green, over to Jennersville Hospital after he reported that he could not move or see and that he didn't feel right. The nursing note from November 26th indicated he returned from Jennersville Hospital and appeared agitated and confused. And his mother called and expressed concern about her son's state of mind and confusion after speaking with him at the hospital.

He was transported again to Jennersville after making remarks that he was not going to be in the commercial and that they were just doing an infomercial after the ambulance arrived. And there is some note for November 26th in the evening note that he was hallucinating at times.

That continued into the following day, as noted by Dr. Khan on the 27th where he noted that Mr. Johnson had been hallucinating, seeing shadows and was incoherent. And he ordered a psych consult at that point. Dr. Rana, the psychiatrist, evaluated him on the 28th and made a diagnosis after looking at the psychiatric history and family history of a mood disorder, as well as an anxiety disorder, ruling out several other things and prescribing Neurontin.

…

Now, as to whether Bowling Green fits within the definition of facility, I think the record, as it was produced during trial, had

sufficient evidence that, in fact, Bowling Green, as part of its program, provides inpatient psychiatric care.

It seems to me that Dr. Khan was overall responsible for the health of his patients and residents, is responsible for making sure that they have proper psychiatric treatment consistent with the level of care offered by that institution. And in the exercise of that duty, he made an explicit referral to Dr. Rana. And it is clear to me that his actions and Dr. Rana's actions are immunized for purposes of this case. And Bowling Green, being such a facility, is likewise immunized.

The gentleman was twice admitted to Jennersville and seen by Dr. Duncklee and then by Dr. Plumb. They apparently had, not everything, they may not have had the Methadone medication, but they did have a history when they looked at him.

The court also … did not see that the Act required a doctor to run out and confirm all medical history on admission. At any rate, in a matter of days there was a psychiatric referral and a diagnosis, The court was persuaded that Jennersville, Dr. Duncklee and Dr. Plumb were all immunized for the same reasons.

Trial Court Opinion, 3/17/17, at 10-13 (citation omitted).

We begin with Appellants' claims against Dr. Rana, as this constitutes the most straightforward application of the MHPA. Appellants' expert, Dr. Glass, testified that Dr. Khan referred Johnson to Dr. Rana for a psychiatric evaluation. *See* N.T., 11/1/16, at 78. Dr. Rana believed his only duty towards Johnson was to determine whether Johnson had "a comorbid psychiatric disorder that need[ed] to be addressed." *Id*., at 79. In fact, Dr. Glass's criticism of Dr. Rana centered on his belief Dr. Rana's care was too compartmentalized; he opined Dr. Rana should have utilized his general medical knowledge to recognize that Johnson was in physical distress. *See*, *eg*., *id*.

Dr. Rana diagnosed Johnson "with mood disorder, anxiety disorder, et cetera, [and] opioid substance abuse induced mood." ***Id***., at 78. As a result, he started treating Johnson with Neurontin, which can be used to treat bipolar disorders. ***See id***., at 79.

Thus, by Appellants' own evidence, Dr. Rana was engaged in the "diagnosis, evaluation, therapy, or rehabilitation" of mental illness in Johnson. The trial court did not err in concluding Dr. Rana was covered by the limited immunity provided by the MHPA.

The application of the MHPA to the remaining defendants is less clear, and indeed, presents a somewhat novel issue. Defendants and the trial court rely upon Johnson's intake forms to support the conclusion that the remaining defendants were involved in treating Johnson's mental illness.

However, the intake forms cut both ways. While they indicated Johnson had a "Current Mental Health diagnosis" of "Bipolar, ADHD," they also indicated Johnson was not currently taking any medication for these diagnoses, nor was he under the care of a psychiatrist. In addition, the "[r]eason for admission" is "[t]o get off the pills." Under "Assessment and Plan of Treatment," only two items are identified: "Benzo detox protocol" and "Methadone Taper." Thus, the forms do not support an inference that Brandywine understood Johnson to be suffering from mental illness or that Brandywine intended to treat Johnson for mental illness.

The timeline established by Appellants' witnesses does not support the conclusion that the remaining defendants interpreted the intake forms as requiring treatment of Johnson's mental illness. Indeed, Johnson was not referred to Dr. Rana for a psychiatric consult until approximately eight days after he was admitted to Brandywine on November 20, 2012. While not conclusive, this evidence certainly can support an inference that Brandywine did not view Johnson as suffering from mental illness for the first week after he was admitted.

Regarding Dr. Duncklee and Dr. Plumb, emergency room physicians who treated Johnson after he had been transferred from Brandywine to Jennersville Hospital by ambulance, the record is similarly inconclusive. Johnson was transferred to Jennersville on November 25, 2012, with a chief complaint of "PAIN-MULTIPLE SITES (NO KNOWN INJURY)." Dr. Duncklee's clinical impression was "1. Vaso-Vagal Syncope 2. Drug Abuse." The recorded medical history for Johnson does not indicate any mental illness.

On the other hand, Dr. Duncklee noted that Johnson occasionally had "a bizarre affect with some rambling, specifically when he was approached with the fact that he tested positive for meth[]amphetamines." Johnson was returned to Brandywine with instructions to have a follow up appointment with his family physician.

Thus, at the time Johnson was seen by Dr. Duncklee, Brandywine had not treated for or diagnosed him with mental illness. He had not yet seen Dr.

Rana. The record is therefore far from clear that Dr. Duncklee diagnosed or treated Johnson for mental illness.

Dr. Duncklee argues that he is entitled to limited immunity under the Act pursuant to **Allen**. In that case, Anne Allen was admitted to Norristown State Hospital for treatment of mental health issues. **See** 696 A.2d at 1176. She was subsequently transferred to Montgomery Hospital "pursuant to a contractual agreement through which Montgomery Hospital would provide medical treatment for mental patients from Norristown State Hospital." **Id**.

Physicians at Montgomery Hospital suspected that her psychiatric medications were causing her medical ailments, and "removed the patient from all but one of her prescribed psychotropic drugs." **Id**. Allen was subsequently found hanging six inches from the floor with a bed restraint around her neck. She suffered permanent brain damage from the incident. **See id**.

Montgomery Hospital contended it was entitled to limited immunity under the MHPA. Allen argued that limited immunity applied only to mental health treatments, not the medical treatment undertaken by Montgomery Hospital.

Our Supreme Court held that Montgomery Hospital was entitled to limited immunity, as, "[a]t that time, the patient was mentally ill and was in acute need of medical care." **Id**., at 1179. Thus, Montgomery Hospital's

medical treatment of Allen was treatment intended to assist Allen in her recovery from mental illness. *See id*.

*Allen* is clearly distinguishable. *Allen* directs that once a patient is being treated for psychiatric issues, any contemporaneous medical treatment must be considered part and parcel of the psychiatric treatment. In contrast, at the time Dr. Duncklee saw Johnson, there is no evidence that Brandywine or any other medical facility or professional was currently treating him for mental health issues. Nor is there any evidence that Dr. Duncklee was even aware of Johnson's psychiatric history. We therefore conclude the trial court erred in applying limited immunity under the MHPA to Johnson's claims against Dr. Duncklee.

The circumstances surrounding Dr. Plumb's care for Johnson are similar, but not identical, to Dr. Duncklee's. On November 26, 2012, Johnson was once again transferred from Brandywine to the Jennersville Hospital emergency room. And once again, this transfer occurred before Dr. Rana's psychiatric assessment.

In contrast, the "Chief Complaint" listed on his medical record was "CONFUSION – NEW ONSET." Also, Dr. Plumb indicated Johnson's medical history included bipolar disorder. However, Dr. Plumb's clinical impression was "Substance Abuse." Dr. Plumb returned Johnson to Brandywine with instructions to follow-up with Brandywine for his "SUBSTANCE ABUSE."

While the circumstances surrounding Dr. Plumb's care are more favorable to a finding that she was engaged in treating Johnson for mental health issues beyond his narcotic addictions, we cannot conclude the circumstances are such that no reasonable jury could find otherwise. Dr. Plumb did not propose a diagnosis of mental illness, nor did she offer any treatment for mental illness. These circumstances, combined with the absence of any evidence Brandywine was contemporaneously treating Johnson for mental health issues, would be sufficient to allow a reasonable jury to find that Dr. Plumb was not engaged in treating Johnson for, or medically treating him in conjunction with treatment for, mental illness. The trial court erred in holding to the contrary.

Appellants only asserted vicarious liability claims against Southern Chester County Emergency Room Associates based upon the actions of Dr. Duncklee and Dr. Plumb. Since we have determined the court erred in dismissing the claims against Drs. Duncklee and Plumb, we must also reinstate the vicarious liability claim against Chester County Emergency Room Associates.

This leaves only the application of the Act to Appellants' claims against Dr. Khan and Brandywine. They were caring for Johnson both before and after Dr. Rana's psychiatric consult. As discussed, there is no evidence Johnson was being treated for mental illness prior to Dr. Rana's consult. Furthermore, we conclude that, due to Dr. Rana's diagnosis and treatment of Johnson's mental

illness, Dr. Khan and Brandywine's actions after the psychiatric consult are covered by the limited immunity provisions of the MHPA.

Thus, we must determine whether Appellants' claims against Dr. Khan and Brandywine are based upon circumstances arising after Dr. Rana's consult. If they are, the limited immunity provisions of the Act apply. If not, the trial court erred in granting nonsuit.

Dr. Glass, Appellants' standard of care expert, provided several incidents where he believed that Dr. Khan failed to properly treat Johnson. Several of these incidents were prior to the psychiatric consult. However, a review of Dr. Glass's testimony reveals the primacy of Dr. Khan's failure to acquiesce to Johnson's transfer to an emergency room the night before he died:

> Q.　Do you have an opinion with regards to Dr. Khan not sending or telling the nurses to absolutely not send [Johnson] to either the ER or another facility on the evening of the 28th?
>
> A.　*My opinion is that, had they sent him, he wouldn't have died*. Somebody would have looked at him. He would have gotten more intensive care. The nurses, I think, were very involved with him, but there is a limit to their abilities in that facility. The next step was not checked.

N.T., 11/1/16, at 86-87 (emphasis supplied).

Thus, Dr. Glass opined that the causative breach of Dr. Khan's standard of care occurred after the psychiatric consult. As a result, the limited immunity provisions of the MHPA applied to Appellants' claim against Dr. Khan.

- 15 -

Similarly, Appellants provided the following expert testimony on the actions of Brandywine's nurses relative to the expected standard of care:

A. …

[T]he biggest role for a nursing staff, they are the eyes and ears. The nurses are staffed 24/7 in any of these kinds of facilities. They are eyes and ears for the provider panel. When they can't be there to watch them, the nurses are there. And because of that, nurses are – one of their roles is to be advocate – to advocate for the patient, to make sure that the patient has his needs met, be it medical or custodial or whatever else.

And to see it – I do realize that the – what they received from the medical staff was that he shouldn't be transferred to the – sent to the ER or transferred out or whatever else, but looking at the pure numbers of his vital signs of how he was behaving and his recent history of how he was, there should have been a heavier advocacy happening for the patient on his behalf by the nurses.

Q. That would be to go to the ER?

A. Yeah. Simply that, yeah.

N.T., 11/2/16, at 80-81. Once again, this testimony focuses on conduct that occurred after the psychiatric consult, and is therefore subject to the limited immunity provisions of the MHPA.

Taken as a whole, we conclude limited immunity properly applies to the Appellants' claims against Dr. Rana, Dr. Khan, and Brandywine. In contrast, limited immunity does not apply to Appellants' claims against Dr. Duncklee, Dr. Plumb, and Southern Chester County Emergency Associates, P.C. This is not, however, the end of our analysis.

Appellants argue the trial court erred in allowing Dr. Duncklee and Brandywine to amend their pleadings after Appellants had rested. After Appellants had finished presenting their case-in-chief, both Dr. Duncklee and Brandywine requested leave to amend their pleadings to include the defense of limited immunity under the MHPA. After initially denying permission, the court ultimately determined Appellants had been placed on notice of the defense when the other defendants had pled it, and therefore there would be no prejudice to Appellants in permitting the amendments.

Given our conclusion that Dr. Duncklee is not entitled to limited immunity under the Act, the issue of whether he should have been allowed to raise the issue is moot. In contrast, we have concluded Brandywine is entitled to the defense of limited immunity. We therefore must determine whether the court erred in allowing Brandywine to raise the issue.

Generally, a party may amend a pleading to add a new defense, so long as he obtains consent from the adverse party or leave of court. **See** Pa.R.C.P. 1033. "Leave to amend … should be liberally granted at any stage of the proceedings unless there is an error of law or resulting prejudice to an adverse party." **Hill v. Ofalt**, 85 A.3d 540, 557 (Pa. Super. 2014) (citation omitted). The rule of liberal leave to amend is premised upon a preference to have claims decided on their merits as opposed to strict enforcement of legal technicalities. **See id**.

Application of this rule here is not straightforward. Brandywine waited until after Appellants had finished presenting evidence before requesting leave to amend their pleadings to raise the issue of limited immunity. The trial court initially declined leave to amend. The court properly noted that under normal circumstances, the late amendment would be unduly prejudicial.

However, the court was persuaded otherwise by the circumstances of this case. It noted that Dr. Khan, Brandywine's agent, had timely pled the defense of limited immunity. As a result, Appellants had been placed on notice of the issue prior to trial. Appellants did not argue, and do not argue on appeal, that application of limited immunity to Brandywine involved factual issues distinct from the application to Dr. Khan or any of the other defendants.

Rather, Appellants argue they were deprived of their procedural rights to challenge the affirmative defense. This argument does not avail them any relief. As noted, Dr. Khan and other defendants timely raised the issue. A review of the trial court dockets does not reveal any preliminary objections filed by Appellants to Dr. Khan's pleading. Indeed, Appellants filed their answer to Dr. Khan's new matter within seven days. It was therefore reasonable for the trial court to assume Appellants would have similarly responded to Brandywine if Brandywine had timely raised the issue in new matter.

Under these circumstances, we cannot conclude the trial court abused its discretion. Appellants had notice that a defendant associated with

Brandywine had raised the issue of limited liability. As a result, it was reasonable for the trial court to find minimal to no prejudice to Appellants. Since the rule favors liberal leave to amend, the court did not err.

In their final issue, Appellants argue the trial court erred in "sua sponte raising the MHPA for Dr. Duncklee and the Estate of Dr. Plumb." We need not address this issue, as we have concluded that limited immunity is not applicable to Dr. Duncklee or Dr. Plumb. Thus, this issue is moot.

In sum, we conclude the trial court properly granted nonsuit to Dr. Rana, Dr. Khan, and Brandywine. We reverse the grant of nonsuit to Dr. Duncklee, Dr. Plumb, and Southern Chester County Emergency Associates, P.C.

Judgment affirmed in part and reversed in part. Case remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/2/18

- 19 -